UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

PETER JOSEPH GERBASI,            )
                                 )
    Plaintiff,                   )
                                 )
    v.                           )   Case No. 5:14-cv-246
                                 )
COMMISSIONER OF SOCIAL           )
SECURITY,                        )
                                 )
    Defendant.                   )

**OPINION AND ORDER**
**(Docs. 10, 11)**

Plaintiff Peter Joseph Gerbasi brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security ("Commissioner") denying his application for supplemental security income ("SSI") and disability insurance benefits. Pending before the court are Gerbasi's motion to reverse the Commissioner's decision (Doc. 10) and remand for calculation of benefits and the Commissioner's motion to reverse the Commissioner's decision and remand for further administrative proceedings. (Doc. 11).

I.   **Background**

Peter Gerbasi was forty-six years old on his alleged disability onset date of December 31, 2011. (AR 355.) Gerbasi obtained a GED and is a veteran of the United States Army, having served for three years in the late 1980s. (AR 147.) He is divorced, and he sees his autistic adult son roughly every other weekend. (AR 697.) Gerbasi's living situation is unstable with periods of homelessness; between the time he filed his applications and the time of the ALJ's decision, he couch-surfed with friends and family, lived in a tent in the woods, lived in his girlfriend's apartment, lived with his mother, lived in a trailer, and slept in the back of someone's car. (AR 92, 436, 521, 632.)

Gerbasi traces his most significant physical impairment—degenerative disc disease—to a 1990 incident in which he tore two discs in his lower back while carrying a wall at work. (AR 1664.) Since then, he has suffered from lower back pain that has worsened with time. (AR 792.) A February 2012 imaging study showed "[i]ntervertebral disc space narrowing at L3-L4 and L4-L5." (AR 533.) A September 2012 imaging study showed moderate changes of degenerative disc disease at L3-L4 and L4-L5, as well as mild spinal stenosis and a tear at L5-S1. (AR 1246-47.) A November 2013 imaging study showed multilevel degenerative disc disease, most prominent at the C5-C6 and C6-C7 levels where his discs bulged. (AR 1307.) Gerbasi's lower back pain causes him difficulty standing, sitting, and walking, and in 2013 he began to use a cane for ambulation and, in 2014, a back brace for pain management. (AR 653, 1233, 1500.) He also tried a TENS unit in 2013, which he found unhelpful. (AR 1219.) Gerbasi has also regularly taken Vicodin, oxycodone, hydrocodone, and ibuprofen to manage his back pain, with minimal success. (AR 110, 507, 965, 1432.)

Gerbasi suffers from chronic hepatitis C and resultant cirrhosis, which causes chronic fatigue. (AR 658, 702.) He is also obese, and in 2012 he participated in a weight loss program upon referral by his social worker. (AR 832, 899.) In 2013 Gerbasi became increasingly dizzy with an unstable gait, and was considered at high risk for falls. (AR 1150, 1177, 1204.) The record documents multiple falls, beginning in 2012 and increasing in frequency through time. (AR 71, 996, 1138, 1171, 1179, 1264, 1513, 1634.)

Gerbasi also suffers from psychiatric impairments. He has been diagnosed with depressive disorder, bipolar disorder, panic disorder, and post-traumatic stress disorder ("PTSD") (AR 627, 699, 767.) His psychiatric symptoms include chronic anxiety, panic attacks, and depressed mood, with occasional passive suicidal ideation. (AR 779, 850, 1020, 1058, 1692.) Gerbasi also suffers from anger management problems, resulting in a diagnosis of "intermittent explosive disorder." (AR 1202.) In 2013, Gerbasi began experiencing auditory hallucinations, which increased in frequency over time. (AR 1138, 1171, 1202, 1205, 1215, 1422.) He hears different voices, some of which encourage him to take ill-advised actions like stealing. (AR 1138.) Gerbasi's mood became so unstable that he was admitted for an eleven-day inpatient hospitalization in November 2013, which led to a diagnosis of schizoaffective disorder upon discharge. (AR 1190, 1302.) Around the same time, Gerbasi began to suffer from

manic phases as well as "white outs," or brief periods during which he was unresponsive to his surroundings and he saw a blank white screen. (AR 1357, 1411, 1422, 1510, 1580.) Gerbasi's Global Assessment of Functioning ("GAF") score has been assessed at anywhere between 40 and 60 (upon discharge from the hospital), with lower scores occurring more frequently in the record. (AR 652, 738, 1185, 1202, 1302, 1426, 1602.)

Gerbasi has also been diagnosed with alcoholism. While for the most part his alcohol dependence is in remission, the record reveals multiple occasions in which Gerbasi had trouble with drinking. (AR 584, 651, 1363, 1634.)

Gerbasi has previously worked as a cook, janitor, and assembly line worker. (AR 388.) On a daily basis he reads, watches television, uses a computer, listens to the radio, naps, and prepares himself a meal. (AR 426.) He also cleans and does laundry, but picks only one task to complete daily because it takes him two to three hours. (AR 427.) He goes out four or five times a week, but sometimes stays inside all day because he is too fatigued. (AR 428.)

Gerbasi's applications for SSI and disability insurance benefits were denied initially and on reconsideration, and a hearing was held on July 16, 2014 before Administrative Law Judge ("ALJ") Thomas Merrill. (AR 145-70.) Gerbasi appeared and testified, and was represented by an attorney. (AR 145.) Christine B. Sanderson, with whom Gerbasi was living at the time of the hearing, testified as a witness on Gerbasi's behalf. (*Id.*) A vocational expert ("VE") also testified at the hearing. (AR 164-69.)

At the hearing, Gerbasi testified about his back pain, fatigue, and psychiatric impairments. He stated that he must take pain medication in the morning and wait fifteen or twenty minutes before getting out of bed due to his back pain. (AR 150.) He keeps a jug by his bed in case the pain medication does not take effect before he can go to the bathroom. (AR 151.) Throughout the day, he alternates between sitting, standing, and lying down, "whichever eases the pain the most." (*Id.*) He also testified that he had difficulty dressing and cooking and that Sanderson cooked for him and helped him move around the house. (AR 153-54.) Sanderson testified that Gerbasi had been living with her for almost one year. (AR 160.) She also stated that it takes Gerbasi a long time to get up in the morning due to pain; that he has difficulty navigating the stairs; and that she calls from work during the day to check on him because he had

fallen a few times before. (AR 161.) Sanderson also testified about his hallucinations. (AR 162.)

## II.   Procedural History

The ALJ issued an unfavorable decision on September 4, 2014. (AR 19-33.) The Appeals Council denied Gerbasi's request for review, rendering the ALJ's decision the final decision of the Commissioner. (AR 1.) Gerbasi appealed to this court on November 13, 2014. (Doc. 1.) On April 22, 2015, Gerbasi moved to reverse the Commissioner's decision for calculation of benefits. (Doc. 10 at 23.) The Commissioner also moved to remand but believes that further administrative proceedings are necessary. (Doc. 11.) The Commissioner recognized that "legal errors in the Commissioner's decision require remand." (Id. at 1.) She also noted that a different "State agency found Mr. Gerbasi disabled as of September 5, 2014," which "requires further evaluation" of Gerbasi's claims for SSI and disability insurance benefits. (*Id.* at 8.)

## III.   The ALJ's Decision

"Disability" under the Social Security Act is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

In evaluating disability claims the Commissioner uses a five-step procedure. *See Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004). At step one the ALJ must determine whether the claimant is presently engaging in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b). If he is not, step two requires the ALJ to determine whether he has a "severe impairment." 20 C.F.R. §§ 404.1520(c), 416.920(c). If the ALJ finds that the claimant has a severe impairment, at step three he determines whether the severe impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). 20 C.F.R.

4

§§ 404.1520(d), 416.920(d). If so, the claimant is presumptively disabled. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ must determine the claimant's residual functional capacity ("RFC"), which is the most the claimant can do in a work setting despite his limitations based on the relevant evidence in the record. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). At step four, the ALJ considers whether the claimant's RFC precludes the performance of his past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). At the fifth and final step, the ALJ determines whether the claimant can do "any other work." 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant bears the burden of proof in the first four steps; at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

The ALJ first determined that Gerbasi met the insured status requirements for disability benefits through December 31, 2014. (AR 22.) Employing the five-step procedure, the ALJ determined that Gerbasi did not engage in any substantial gainful activity since his alleged disability onset date of December 31, 2011. (*Id.*) At step two, the ALJ found that Gerbasi had the following severe impairments: "degenerative disc disease, chronic liver disease, an affective disorder, an anxiety disorder, and a personality disorder." (*Id.*) At step three, the ALJ found that Gerbasi did not have an impairment or combination of impairments that met or medically equaled an impairment in the Listings. (*Id.*)

The ALJ then found that:

> [Gerbasi] has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b) except he could lift and carry twenty pounds occasionally and ten pounds frequently; stand or walk for six hours and sit for six hours in an eight-hour day; occasionally climb ladders, ropes, or scaffold, crawl, or stoop, but frequently climb ramps or stairs, and engage in unlimited balancing, kneeling, and crouching; and avoid concentrated exposure to vibration and respiratory irritants. Despite his mental impairments, he could sustain concentration, persistence, or pace for one-to-three step tasks for two-hour blocks of time; he could interact with co-workers and supervisors; and he could deal with routine changes and safety concerns.

(AR 24.) The ALJ found that Gerbasi was capable of performing his past relevant work as a janitor. (AR 31.) He also concluded based on Gerbasi's RFC and the VE's testimony that there are other jobs in significant numbers in the national economy that Gerbasi could perform, such as price marker, laundry classifier, and small products assembler. (AR 32.) Finally, the ALJ concluded that Gerbasi had not been under a disability from his alleged onset date through September 4, 2014, the date of his decision. (AR 33.)

## IV.   Standard of Review

This court reviews "the administrative record *de novo* to determine whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard."[1] *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). "Substantial evidence is 'more than a mere scintilla'; it is 'such relevant evidence as a reasonable person might accept as adequate to support a conclusion.'" *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Where there is substantial evidence to support either position, the determination is one to be made by the factfinder." *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990). The court should keep in mind "the fact that the Social Security Act is a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## V.   Analysis

Gerbasi argues that the ALJ erred in evaluating the treating source and other opinions on record and failed to consider Sanderson's testimony. (Doc. 10 at 10-16.) He also argues that the ALJ's RFC assessment and credibility determination are not supported by substantial evidence. (*Id.* at 16-17, 18-22.) Gerbasi further argues that the ALJ selectively interpreted the record evidence to support a finding of non-disability and that the Appeals Council erred in failing to consider additional evidence. (*Id.* at 17-18, 22-23.)

---

[1] The standard of review is the same for SSI and Social Security disability cases, and the same case law is applicable to both kinds of benefits. *See* 42 U.S.C. § 1383(c)(3).

6

A.     **Opinion Evidence**

Gerbasi argues that the ALJ gave too little weight to the treating source opinions and an examining source's opinion.

The regulations provide for according different weight to sources who furnish opinions to the Commissioner. Medical opinions from acceptable medical sources such as treating physicians are accorded controlling weight if "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If the ALJ does not afford a treating physician's opinion controlling weight, he or she must explain why, taking into account the factors listed at 20 C.F.R. § 404.1527(c), including:

> (i) [T]he frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

*Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). The ALJ must give "good reasons" for the weight he gives to a treating physician's opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

An "other" medical source, such as a licensed clinical social worker, cannot issue a "medical opinion," 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2), and can only provide evidence of the severity of an impairment and how it affects a claimant's ability to function at work. 20 C.F.R. § 404.1513(d). An opinion from such a source is not entitled to the controlling weight accorded to medical opinions from acceptable medical sources. However, "other" medical sources, "such as . . . licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists." SSR 06-03p, 2006 WL 2329939, at *3. Accordingly, "[o]pinions from these medical sources, who are not technically deemed 'acceptable medical sources' . . . , are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." *Id.* The same factors used in assessing weight accorded to medical opinions "can be applied to opinion evidence from 'other sources.'" *Id.* at *4.

7

By contrast, opinions furnished by State agency physicians are not entitled to any controlling or greater weight, although they are also evaluated according to the listed factors. Generally, more weight should be given to the opinions of physicians who examine the claimant than to the opinions of non-examining agency consultative physicians, who only review the administrative record. *See* 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1).

### i.   Treating Physician Richard Orlan, M.D.

Gerbasi first takes issue with the ALJ's decision to afford limited weight to the opinion of Dr. Richard Orlan, M.D., Gerbasi's treating physician. Dr. Orlan has been Gerbasi's primary care provider since in March 2012. (AR 1489.) Dr. Orlan wrote a March 28, 2014 opinion letter in which he stated that Gerbasi had a "low level of ability to function physically for any length of time" due to his chronic lower back pain. (*Id.*) Dr. Orlan opined that Gerbasi "lacks the capacity for full-time employment." (*Id.*) Dr. Orlan cited the "multiple imaging studies and subspeciality and rehabilitation evaluations" as support for Gerbasi's limitations. (*Id.*) The ALJ gave Dr. Orlan's opinion limited weight because he "failed to provide a function-by-function assessment . . . but rather merely provided vague and unclear statements of disability, which is an issue reserved to the Commissioner"; failed to cite to the imaging studies he referenced in the record; and because Gerbasi appeared to engage in physical activity beyond that which Dr. Orlan's opinion would allow, such as living and hunting in the woods, exercising in a gym, and walking. (AR 30.)

The ALJ was correct in discounting Dr. Orlan's opinion that Gerbasi could not work. *See* 20 C.F.R. § 404.1527(d) (advising that opinions "that would direct the determination or decision of disability" are reserved to the Commissioner). However, the remainder of the ALJ's reasons for giving little weight to Dr. Orlan's opinion are not "good" ones. First, while a "function-by-function assessment" would have been more useful than not, the fact that Dr. Orlan's opinion did not include one should not diminish the force of what it did include. Second, the regulations do not require a treating physician to provide record citations to the evidence supporting his opinion. The "imaging studies" referenced by Dr. Orlan are in the record and support his opinion. (AR 533, 1246-47, 1307.) Finally, the ALJ mischaracterized the frequency and extent of Gerbasi's physical activity. While the record reveals that Gerbasi lived in the woods, it further reveals that Gerbasi lived in the woods by necessity and that he faced increased physical

8

difficulty in doing so. (AR 794.) The record also reveals that Gerbasi obtained only a month-long gym membership and that exercising and walking hurt his back. (AR 768.) Nor should Gerbasi be penalized for following the recommendation of his treating therapist that he lose weight. (AR 896.)

### ii.     Examining Occupational Therapist Mark Coleman

The ALJ also afforded limited weight to the opinion of consulting examining occupational therapist Mark Coleman, whose opinion Dr. Orlan explicitly agreed with. (AR 1727.) On June 23, 2014 Coleman issued a functional capacity evaluation in which he found that Gerbasi had "poor function for trunk strength activities" and for activities such as bending and squatting. (AR 1665.) He found that Gerbasi had good hand function. (*Id.*) Coleman reported that Gerbasi was able to complete just over two hours of the four-hour evaluation before he had to stop due to pain. (*Id.*) Despite the shorter duration of the evaluation, Coleman observed "[f]airly good consistency" and "[s]ome competitive performance behaviors." (*Id.*) While Coleman noted that "Gerbasi had a tendency to catastrophise when describing his injuries," he found that "[s]ubjective reports of activity tolerances were consistent with [Gerbasi's] presentation." (*Id.*) Coleman also reported that the evaluation caused Gerbasi to be in extreme pain throughout the night and the following day. (*Id.*) Coleman opined that Gerbasi was "functioning at a conditional sedentary (10 lb) work capacity" and that he would be limited to "3-4 hours per day." (AR 1664-65.)

The ALJ gave Coleman's opinion "lesser" weight because it was based on an "isolated evaluation"; Gerbasi's failure to complete "more than half of the evaluation due to subjective reports of pain" resulted in "insufficient objective metrics from which to assess [Gerbasi's] maximum [RFC]"; Gerbasi's complaints of pain were not fully credible in light of the "lack of significant objective findings" and "his lack of management beyond medication and occasional use of the brace"; and the functional capacity evaluation was "ordered by counsel in an advocacy role." (AR 29.)

These are likewise not "good" reasons for discounting an examining source's opinion. First, the fact that Coleman's opinion was based on an "isolated evaluation" should influence the weight given his opinion no more than it should any agency examining physician, such as Dr.

9

Ann Fingar, M.D., whose opinion the ALJ accorded "significant weight" despite likewise being based on an "isolated incident." Second, the fact that Gerbasi's pain prevented him from completing the entirety of the contemplated four hour exam—having completed just over half and not just under half, as the ALJ incorrectly deduced—is not a compelling reason to give Coleman's opinion lesser weight, especially because Coleman explicitly factored the decreased length of the evaluation into his opinion. Third, the ALJ's reasons for maligning Gerbasi's credibility are not entirely compelling. Objective findings supported his complaints of pain, such as the multiple imaging studies of his back discussed above. Moreover, in addition to medication, Gerbasi attempted to manage his back pain with a TENS unit, which provided limited relief. Finally, the fact that Gerbasi's lawyer arranged the functional capacity evaluation is not an appropriate reason to discredit it. If the ALJ found reason to doubt Coleman's neutrality, he should have so stated and explained why.

### iii. Treating Psychiatrist Edward MacPhee, M.D., and Treating Psychotherapist Ruth Kenrick, M.A., LICSW

Gerbasi also contends that the ALJ erroneously gave limited weight to the joint opinion of his treating psychotherapist Ruth Kenrick, M.A., LICSW, and treating psychiatrist, Edward MacPhee, M.D., both of whom treated Gerbasi through the Veterans Administration Medical Center. On December 12, 2013, Kenrick and Dr. MacPhee opined that Gerbasi was unable to meet competitive standards or had no useful ability to function in sixteen different mental abilities required to do unskilled work, such as the ability to "remember work-like procedures," "maintain attention for two hour segment," "work in coordination with or proximity to others without being unduly distracted," and "get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes." (AR 1428.) They opined that he had no useful ability to function in abilities required to do skilled or semi-skilled work. (AR 1429.) They further opined that he was seriously limited in interacting appropriately with the general public; maintaining socially appropriate behavior; traveling in unfamiliar places; and using public transportation. (*Id.*) They explained that Gerbasi is "intermittently explosive and struggles with basic reality testing," and they cited Gerbasi's bipolar disorder, low GAF scores, and his psychiatric hospitalization as the clinical and diagnostic bases for their opinion. (AR 1426-27.)

The ALJ afforded Kenrick's and Dr. MacPhee's opinion limited weight because it "consists primarily of check-marked findings, with limited narrative support or citation to the record"; Gerbasi's clinical presentation is mild in the record, which includes GAF scores "regularly at 60"; and Gerbasi does not display deficits in attention, concentration, memory, or interaction, as evidenced by his couch-surfing and reading abilities. (AR 30-31.)

The first two are not "good" reasons for discounting the opinion of Gerbasi's treating psychotherapist and psychiatrist. First, the fact that much of the opinion consists of "check-marked findings" is not a sufficient reason to discount it where the clinical and diagnostic bases for the opinion are included. Treating sources are not required to provide specific citations to the medical record to support their opinions. The record contains treatment notes from both Kenrick and Dr. MacPhee, covering over two years of regular treatment, which generally supports their opinion. (*E.g.*, AR 652, 767, 775, 1044, 1138, 1174-76, 1422, 1510, 1564-65, 1580, 1613-19, 1634-35, 1658-59, 1692-95.) Second, the ALJ mischaracterized the record's GAF scores; they were assessed as low as 40, and were consistently assessed at 43 or 50. (AR 652, 738, 1185, 1202, 1302, 1426, 1602.)

The ALJ's third reason for discounting Kenrick's and Dr. MacPhee's opinion is acceptable, at least for the period before October 1, 2013. Kenrick's treatment notes consistently report no memory problems and "clear, coherent, logical and goal-directed" thought processes. (*E.g.*, AR 1044, 1422.) Dr. MacPhee also consistently observed that Gerbasi's attention and concentration were "grossly intact." (*E.g.*, AR 1139.) However, any discounting of the memory components of their opinion should be tempered by the fact that as Gerbasi's symptoms worsened, Kenrick began noting his difficulty remembering questions and noted on January 30, 2014 that both she and Dr. MacPhee "see that [Gerbasi] appears easily confused." (AR 1565, 1613, 1659.) Overall, the ALJ's decision to afford the opinion of Gerbasi's treating psychiatrist and psychotherapist limited weight is not supported by substantial evidence.

All of the above errors require remand and undermine the ALJ's RFC determination for the entirety of the period at issue. The court pauses here to make a more general observation concerning the opinion evidence and the ALJ's evaluations of it. It is notable that all of Gerbasi's treating sources who furnished opinions—including his primary care provider, psychiatrist, and psychotherapist—would, if accorded controlling weight, substantially support a

11

determination that Gerbasi was disabled.[2] In addition, two evaluating sources, Coleman and agency physician Dr. John Leppman, M.D. (AR 701-03), furnished opinions which would, if given significant weight, also substantially support a finding of disability. The only opinions on record which do not support a finding of disability were furnished by an agency evaluating physician and two agency consulting physicians—those furthest removed from an accurate ability to evaluate the severity of Gerbasi's symptoms and their limiting effects on his functioning. The ALJ therefore gave most weight to the agency consulting physicians and least weight to the evaluating and treating physicians and sources. The ALJ also gave most weight to only those opinions that support a finding of non-disability, and he gave least weight to those opinions which would substantially support a finding of disability. This outcome does not accord with the general proposition that examining sources be given greater weight than non-examining sources. *See* 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1).

### B. Witness Testimony

Gerbasi also argues that the ALJ failed to consider Christine Sanderson's testimony. (AR 160.) Sanderson testified that she worked at Brattleboro Memorial Hospital as a cleaner, a position she had held for twenty-six years. (AR 160.) She stated that Gerbasi had been living with her for almost a year because she "took pity on him because he didn't have a place to live." (AR 161.) Sanderson testified that Gerbasi has difficulty navigating the stairs in her apartment, needing to climb very slowly, hang onto the railing with his cane, and stop every couple of steps. (*Id.*) She stated that she called him periodically during the day to check on him "because there was a couple times when I have gone home, he's been laying on the floor because he's lost his balance." (*Id.*) She also confirmed that Gerbasi did not move in the morning until after his medications set in. (AR 162.) Regarding his mental impairments, Sanderson testified: "[S]ometimes it is like he doesn't even know I'm around. I'll say something and he doesn't even realize what I said because he hears things and sees things that aren't there." (*Id.*) She also stated that she has heard him speaking to someone who is not there. (AR 162-63.)

---

[2] It is also notable that Dr. Orlan agreed with Coleman's opinion and that Kenrick and Dr. MacPhee agreed with each other's opinions such that they furnished a joint opinion. Because medical opinions themselves constitute evidence, *see* 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2), the fact that two opinions support each other's positions increases the evidentiary support for the substance of those opinions relative to the opinions lacking such concurrence.

The ALJ must consider relevant evidence from non-medical sources, including "spouses, relatives, and friends." SSR 06-03p, 2006 WL 2329939, at *3; *see also* 20 C.F.R. §§ 404.1513(d)(4), 416.913(d)(4). In considering evidence from such sources, "it would be appropriate to consider such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence." SSR 06-03p, 2006 WL 2329939, at *6; *see also* 20 C.F.R. § 416.929(a) ("We will consider . . . any description . . . other persons may provide about how the symptoms affect your activities of daily living and your ability to work . . . ."). Additionally, "where an ALJ rejects witness testimony as not credible, the basis for the finding 'must be set forth with sufficient specificity to permit intelligent plenary review of the record.'" *Collins v. Comm'r of Soc. Sec.*, 960 F. Supp. 2d 487, 499 (S.D.N.Y. 2013) (citing *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 260-61 (2d Cir. 1988)) (internal modification omitted).

The ALJ's decision does not mention Sanderson's testimony. Accordingly, the court is unable to determine whether the ALJ considered it and if so, how credible he found the witness and how much weight he gave her testimony.

## C.   The ALJ's Credibility Determination

Gerbasi contends that the ALJ's credibility finding is not supported by substantial evidence. In evaluating credibility, the ALJ first "must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). If so, the ALJ must then consider a claimant's symptoms, including pain, "and the extent to which [they] can reasonably be accepted as consistent with the objective medical evidence, and other evidence." 20 C.F.R. § 416.929(a). Such "other evidence" includes statements from the claimant, treating and non-treating sources, and any other people about the claimant's "medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how [the claimant's] impairment(s) and any related symptoms affect [his] ability to work." *Id.*

The ALJ found that the objective evidence did not fully support Gerbasi's statements concerning the severity of his symptoms. (AR 25.) The ALJ recognized Gerbasi's progressively worsening degenerative disc disease as revealed by imaging studies as well as his chronic liver

disease. However, he discounted Gerbasi's credibility because he found that Gerbasi did not consistently seek treatment for his back pain and failed to pursue treatment for his cirrhosis. (AR 26.)

The ALJ's credibility determination regarding Gerbasi's back pain is not supported by substantial evidence because he mischaracterized the record. First, short of surgery (which the court has noted was an option Gerbasi reasonably rejected), regularly taking medication such as Vicodin and Oxycodone is a significant attempt to manage pain. Second, the record reveals that Gerbasi requested a TENS unit for months before receiving one, and found it did not relieve his pain. (AR 1219.)

Regarding Gerbasi's cirrhosis treatment, the record reveals that Gerbasi participated in a study which reduced the viral load of hepatitis C, but was removed from the study due to his "extreme mood swings." (AR 554, 570.) The ALJ erroneously faulted Gerbasi for not seeking additional treatment for his liver problems. The record reveals that Gerbasi sought additional hepatitis C/cirrhosis treatment on multiple occasions due to his fatigue but was told by his healthcare providers to wait for a new therapy to become available after predicted clearance by the FDA. (AR 584, 591, 597, 598-99.)

Additionally, the ALJ failed to account for the significant amount of evidence in the record substantiating Gerbasi's testimony regarding his symptoms of pain and fatigue, such as Sanderson's testimony; the opinions of Coleman and Dr. Orlan; and the various treatment notes regarding Gerbasi's pain—including his treatment providers' independent observations of his pain and unstable gait. (*E.g.*, AR 792, 795, 863, 965, 1012, 1164, 1173, 1177, 1188, 1350, 1412, 1520, 1563, 1582, 1629, 1656.)

The ALJ discounted Gerbasi's credibility regarding his psychiatric symptoms because Gerbasi "frequently no-show[ed] for mental health appointments," his 'clinical presentation has been quite mild," including GAF scores of 60, and because Gerbasi's daily activities belied the severity of his stated limitations. (AR 27-28.) The ALJ's credibility determination regarding Gerbasi's psychiatric symptoms does not find substantial support in the record. As Gerbasi's treating psychiatrist and psychotherapist explained in a letter following the ALJ's decision, the "most impaired patients frequently forget appointments, fail to organize their lives to facilitate

attendance, or are on occasion too symptomatic to leave the house." (AR 10); *see also* SSR 96-7p, 1996 WL 374186, at *7 ("[T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide."). As discussed above, the ALJ clung to a GAF score of 60, although the record as a whole reveals that 60 was an outlier in terms of Gerbasi's social functioning capacity throughout the relevant period. (AR 652, 738, 1185, 1202, 1302, 1426, 1602.) Rather than presenting as "quite mild," Gerbasi consistently presented as depressed, sometimes with slurred speech, and his treatment for panic attacks and hallucinations is documented in the record. (AR 1020, 1058, 1094, 1129, 1138, 1143, 1150, 1153, 1205, 1215, 1303, 1510, 1563, 1564, 1580, 1692.)

The ALJ correctly identified activities Gerbasi engaged in—such as playing chess and attending a Harley event—that would appear beyond his capacity were his testimony accepted at face value. However, these appear to be one-time or short-lived activities that are far outweighed by the evidence in the record supporting Gerbasi's allegations. For instance, a treatment record notes that Gerbasi attended one Harley event, "[d]espite his increased stress," but "other than this one event, [he] reports he continues to isolate and often to feel anxious even within his own apt." (AR 111.) Additionally, the ALJ did not consider evidence that Gerbasi performed certain activities—living in the woods, exercising at the gym, or attending an Aikido class—with physical difficulty. (AR 768, 794, 1634.)

The ALJ's credibility determination is therefore not supported by substantial evidence.

### D. Treating Physician Letter Submitted to Appeals Council

Gerbasi argues that the Appeals Council erroneously failed to consider a September 24, 2014 letter from his mental health providers Kenrick and Dr. MacPhee. The Appeals Council is required to consider any "new and material evidence related to the period on or before the date of the ALJ hearing decision" that a claimant submits to it. 20 C.F.R. § 404.970(b). The Appeals Council "will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record." *Id.*

In its notice denying Gerbasi's request for review, the Appeals Council noted that Gerbasi submitted a "medical statement" from Kenrick and Dr. MacPhee but stated that it did not

15

meet the criteria for consideration. (AR 2.) This was error. Because the letter set forth the opinion of a treating physician addressing Gerbasi's functioning during the relevant period,[3] it was new and material evidence that the Appeals Council was required to consider. *See Canales v. Comm'r of Soc. Sec.*, 698 F. Supp. 2d 335, 341-42 (E.D.N.Y. 2010) (holding that treating physician opinion submitted to Appeals Council was new and material evidence).

In addition to considering the letter, the Appeals Council should have evaluated it according to the treating physician rule. "The treating physician rule applies with equal force to the Appeals Council's consideration of new and material evidence . . . ." *Borsching v. Colvin*, No. 14-CV-6092L, 2015 WL 1868360, at *5 (W.D.N.Y. Apr. 23, 2015); *see also Moss v. Colvin*, No. 1:13-cv-731-GHW-MHD, 2014 WL 4631884, at *24 (S.D.N.Y. Sept. 16, 2014) (While "[t]he regulations do not require the Appeals Council to provide explicit written findings with respect to any new evidence and its impact in light of the overall record," the Appeals Council must provide sufficient analysis for the "reviewing court to determine whether its decision is supported by substantial evidence.").

### E.     Disposition

The parties disagree whether the matter should be remanded for calculation of benefits or for further proceedings. The court may affirm, modify, or reverse the decision of the Commissioner upon the pleadings and record, "with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Remanding for further proceedings is appropriate where "there are gaps in the administrative record or the [ALJ] has applied an improper legal standard." *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996). However, "[w]here application of the correct legal standard could lead to only one conclusion, [the Court] need not remand." *Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998.) The court should only order a calculation of benefits "when the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose." *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980).

The court concludes that remand for further proceedings is unnecessary and orders calculation of benefits. The record provides persuasive evidence that Gerbasi suffered from

---

[3] The letter was written less than three weeks after the ALJ's decision was issued. The letter discussed Gerbasi's global functioning limitations both during and after the relevant period.

16

psychiatric impairments that met the severity of at least listed impairment 12.03. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.03. *See Johnson v. Astrue*, 493 F. Supp. 2d 652, 657 (W.D.N.Y. 2007) (holding in first instance that plaintiff's schizophrenia qualified as a listed impairment). This Listing deals with psychotic disorders such as schizoaffective disorder.

On October 9, Kenrick's notes indicate that Gerbasi reported "intermittent auditory hallucinations, which . . . occur more frequently when he is angry or elated." (AR 1150.) Kenrick recorded Gerbasi's statement that he speaks with them, until "Christine [Sanderson] comes in, and says something like 'you know there's nobody there like.'" (*Id.*) The substance of this treatment record was corroborated almost a year later by Gerbasi's and Sanderson's testimony. Also on October 9, Gerbasi reported his "white-outs" to Dr. Orlan, his treating physician. (AR 1144.) The decline of Gerbasi's mental health, including hallucinations—which now sometimes have visual components as well—dizziness, slurred speech, confusion, and memory problems, is well documented in the record. (AR 1150, 1153, 1162, 1174, 1580, 1613, 1659.) After Dr. MacPhee noted on October 31 how "concerning" Gerbasi's worsening psychotic symptoms were, Gerbasi was hospitalized in November, emerging with a diagnosis of schizoaffective disorder. (AR 1174, 1190, 1302.) Because the record shows medically documented persistence of hallucinations, Gerbasi's personality disorders satisfy the first requirement of Listing 12.03. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.03A.

The record also provides persuasive evidence that Gerbasi faced marked difficulties in maintaining social functioning and marked difficulties in maintaining concentration, persistence, or pace, satisfying the Listing's remaining criteria. *Id.* § 12.03B. Two psychiatric treating sources, Kenrick and Dr. MacPhee, opined on December 12, 2013 that Gerbasi was either unable or seriously limited in the following abilities: remember work-like procedures; understand and remember very short and simple instructions; maintain attention for a two-hour segment; understand and remember detailed instructions; interact appropriately with the general public; and maintain socially appropriate behavior. (AR 1427-28.) They further opined that his symptoms would cause him to be absent from work more than four days per month. (AR 1430.) They reiterated their opinion on September 24, 2014, roughly three weeks after the ALJ issued his decision. (AR 10-11.) Kenrick and Dr. MacPhee's treatment notes support their opinion, as they document his increased hallucinations, "white-out" experiences, and GAF assessments in the 40s range, indicating "serious symptoms or any serious impairment in social, occupational, or

school functioning." *Hill v. Astrue*, No. 5:11-cv-00026 NPM, 2012 WL 2178925, at *3 n.3 (N.D.N.Y. June 13, 2012) (citing American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed. 2000) (DSM-IV-TR)).

The record therefore provides persuasive evidence that Gerbasi met Listing 12.03. *See Johnson v. Astrue*, 493 F. Supp. 2d 652, 657-58 (W.D.N.Y. 2007) (remanding for calculation of benefits under Listing 12.03 where the record documented plaintiff's hallucinations and marked difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace); *Garcia v. Comm'r of Soc. Sec.*, 496 F. Supp. 2d 235, 241 (E.D.N.Y. 2007) (remanding for calculation of benefits where record provided persuasive proof that plaintiff met the criteria of Listing 12.04).

The record also provides persuasive evidence that Gerbasi's degenerative disc disease was disabling. His back symptoms progressively worsened since his initial 1990 injury. The three sets of imaging studies in the record—showing progressive deterioration of his lower back condition—provide objective support for the severity of Gerbasi's symptoms, which were corroborated by a witness and by treatment notes. (AR 533, 1246-47, 1307.) The imaging studies also provide support for the opinion of examining occupational therapist Coleman—adopted by Gerbasi's treating physician, Dr. Orlan—that Gerbasi could not work more than three to four hours of sedentary work per day and therefore lacked the RFC to perform full-time even sedentary work under the regulations. (AR 1665, 1727.) *See also Brown v. Bowen*, No. 82 CIV. 3403 (TPG), 1988 WL 138157, at *7 (S.D.N.Y. Dec. 14, 1988) ("If plaintiff could only sit for 3-4 hours per day, that would not support a finding that she could perform sedentary work.").

Because the record provides persuasive evidence of disability, remand for further proceedings would "serve no productive purpose, would not produce findings contrary to [the court's] conclusions, and would only cause further delay." *Lavalley ex rel. A.W. v. Colvin*, No. 7:12-CV-771 (MAD/VEB), 2013 WL 2444203, at *15 (N.D.N.Y. June 5, 2013).

## VI.    Conclusion

For the reasons stated above, Gerbasi's motion is GRANTED and the Commissioner's motion is DENIED. The court REMANDS the matter for calculation of benefits.

Dated at Rutland, in the District of Vermont, this 21st day of July, 2015.

                                            Geoffrey W. Crawford, Judge
                                            United States District Court